NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN PARADISE, | Civil Action No. 13-05987 (SDW)(SCM) |
| Plaintiff, | |
| v. | **OPINION** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | November 17, 2014 |

**WIGENTON,** District Judge.

Before the Court is Plaintiff John Paradise's ("Plaintiff" or "Paradise") appeal of the final administrative decision of the Commissioner of Social Security ("Commissioner") that he is not disabled under Title II, 42 U.S.C. § 1614(a)(3)(A), of the Social Security Act (the "Act"). This appeal is decided without oral argument pursuant to Local Civil Rule 9.1(b). This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons set forth below, this Court **REMANDS** the Commissioner's decision.

I.   FACTUAL AND PROCEDURAL BACKGROUND

   A.  Procedural History

On March 30, 2009, Plaintiff filed a Title II application for Disability Insurance Benefits and a Title XVI application for Supplemental Security Income. (R. 12.) Plaintiff's claim was denied both initially and upon reconsideration. (R. 12.) Subsequently, Plaintiff requested a hearing, which was held on March 2, 2011 before Administrative Law Judge Donna Krappa ("ALJ Krappa" or "ALJ"). (Id.) On August 24, 2011, the ALJ issued a decision denying the Plaintiff's applications,

1

concluding that Plaintiff was not disabled at step five of the sequential analysis. (R. 12-22.) Thereafter, Plaintiff sought an Appeals Council review, and on August 8, 2013 the Council upheld the ALJ's decision. (R. 1-4.) On October 8, 2013, Plaintiff commenced this action, seeking a determination that the ALJ improperly evaluated his treating physician's opinions, and that her hypothetical question to the vocational expert was improper. (Plaintiff's Brief ("Pl. Br.") 2.)

### B. Personal and Employment History

Plaintiff is a forty-six-year-old male with a G.E.D. (R. 152, 175.) He is single with no children, and resides with his parents. (R. 17.) Prior to his application for disability benefits, Plaintiff held several jobs, including telemarketer, construction laborer, bartender, stockbroker, electrician, and loan officer. (R. 171.)  Most recently, Plaintiff worked as an auto parts deliveryman. (Id.) Plaintiff has not worked since December 1, 2006. (R. 12, 170.)  He alleges that he became disabled as of January 1, 2007, based primarily upon bipolar disorder and depression, as well as osteoarthritic changes in both knees, back pain, and breathing difficulties. (Id.) Plaintiff is 6'2" tall and weighs between 220 and 230 pounds. (R. 17, 169.)

On February 25, 2009,[1] as a condition for probation on a drug possession charge, Plaintiff was enrolled in outpatient treatment at the Mental Illness Chemical Abuse Program ("MICA") at Bergen Regional Medical Center.[2] (R. 294.)  He was discharged from the program on April 30, 2009 with a diagnosis of bipolar disorder and was prescribed Wellbutrin, Lamictal, and Seroquel. (Id.)  At that time, Plaintiff received a Global Assessment of Functioning ("GAF") score of 52. (R. 307.)

---

[1] Although the treatment notes from Bergen Regional Medical Center are the earliest medical notes in the record, Plaintiff alleges that he started receiving psychiatric treatment relating to his bipolar disorder and depression from Dr. Acquaviva in 2000. (*See* Pl.'s Br. 5; R. 55-56.)
[2] Plaintiff has a history of drug abuse and has been jailed three times for drug possession. (R. 18.)

2

On June 6, 2009, Plaintiff was evaluated by consultative physician Dr. Harold Goldstein. (R. 237.) Dr. Goldstein noted that Plaintiff had a GAF of 60. (R. 239.) Dr. Goldstein reported that although Plaintiff was irritable, he was cooperative and responsive to all questions, had no apparent psychomotor impairment, and displayed intact judgment and a good fund of knowledge. (R. 237-39.) He diagnosed Plaintiff with mood and personality disorders, but concluded that Plaintiff's symptoms did not rise to the level of a bipolar disorder. (Id.)

On June 11, 2009, consultative physician Dr. Robert Starace completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity ("RFC") form based on prior evaluations of Plaintiff by other physicians and his own evaluation of the Plaintiff. (R. 240-54.) Dr. Starace found that Plaintiff had mild to moderate limitations in daily living activities, maintaining social functioning, concentration, persistence, and pace, and had no episodes of decompensation. (R. 248.) Dr. Starace also noted that Plaintiff would have mild limitations interacting with the public, accepting instructions and criticisms from supervisors, and maintaining relationships with coworkers. (R. 253.) Ultimately, Dr. Starace concluded that Plaintiff's "mood difficulties" satisfied none of the diagnostic criteria. (R. 240-54.)

Regarding Plaintiff's physical limitations, on July 22, 2009, during an examination by Dr. Richard Mills, a consultative examiner, Plaintiff reported that he had had three knee surgeries and complained of knee and neck pain. (R. 258.) Dr. Mills found that Plaintiff had minimal crepitus in both knees, left patellar crepitus accompanied by pain, decreased cervical range of motion and no reflexes in his lower extremities. (R. 259.) Also, on August 22, 2009, Dr. Benjamin Cortijo, medical consultant for the state, examined Plaintiff and opined that Plaintiff could "lift 10 pounds frequently, 20 pounds occasionally, as well as sit, stand or walk about six hours in an eight-hour workday." (R. 267.)

In November 2009, Plaintiff allegedly resumed mental treatment with treating physician Dr. Joseph Acquaviva—Dr. Acquaviva indicated that he treated Plaintiff monthly beginning in March of 2000, but there are no treatment notes on the record before November of 2009. (R. 31-33, 334.) Dr. Acquaviva performed a Mental RFC assessment of Plaintiff and concluded Plaintiff was bipolar, and identified nine different symptoms he suffered from, including: poor memory, mood disturbance, difficulty thinking or concentrating, and generalized persistent anxiety. (Id.) Dr. Acquaviva also indicated that the side effects of Plaintiff's prescribed medications, Lamictal and Seroquel were fatigue and lethargy. (R. 335.) Dr. Acquaviva opined that Plaintiff's treatment would cause him to miss more than three days of work per month, and that Plaintiff had poor to no ability to perform jobs requiring unskilled work. (R. 337.) However, Dr. Acquaviva did not complete the last portion of the assessment regarding Plaintiff's functional ability with respect to daily living, difficulties in maintaining social functioning, deficiencies of concentration, and episodes of decompensation. (R. 338.)

On February 2, 2011, Plaintiff returned to Dr. Acquaviva for another functional capacity assessment, specifically regarding drug and alcohol abuse. (R. 494.) Dr. Acquaviva noted many of the same symptoms highlighted in his original assessment, but found significant improvements in Plaintiff's ability to perform unskilled and other types of work. (R. 488-99.) Additionally, this time around, Dr. Acquaviva completed the functional limitation matrix, noting that Plaintiff had slight limitations in activities of daily living and social functioning, and frequent concentration issues, and repeated episodes of decompensation. (R. 499.) Lastly, he noted Plaintiff's GAF was 52, which was lower than his previous two GAF assessments of 55 and 65. (R. 334, 495.)

## II.     LEGAL STANDARD

### A. Standard of Review

Under 42 U.S.C. § 405(g) district courts have plenary review of the ALJ's decision to deny a plaintiff's application for Social Security benefits. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). A reviewing court must uphold the ALJ's factual determinations if they are supported by "substantial evidence." 42 U.S.C. § 405(g); *Fargnoli v. Massanari*, 247 F.3d 24, 38 (3d Cir. 2001); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence means more than "a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Furthermore, "[t]his standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence.'" *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The ALJ must consider and weigh all the pertinent medical and non-medical evidence, and "adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000). However, if the factual record is adequately developed, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consol. v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Additionally, a reviewing court may not set aside an ALJ's decision simply because a reviewing court would have reached a different decision. *Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 479 (3d Cir. 2007) (citation omitted). The court is required to give substantial weight and deference to the ALJ's findings. *See Scott v. Astrue*, 297 F. App'x 126, 128 (3d Cir. 2008).

In considering an appeal from a denial of benefits, remand is appropriate "where relevant, probative and available evidence was not explicitly weighed in arriving at a decision on the plaintiff's claim for disability benefits." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) (quoting *Saldana v. Weinberger*, 421 F. Supp. 1127, 1131 (E.D. Pa. 1976)). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984).

**B.  Standard for Determining Eligibility of Disability Benefits**

The Social Security Administration has promulgated a five-step evaluation to be used in determining whether an individual is entitled to Social Security disability benefits. *See* 20 C.F.R. § 404.1520. If the ALJ finds that the claimant is disabled or not disabled at a given step the inquiry does not proceed any further. 20 C.F.R. § 404.1520(a)(4). At the first step of the evaluation, the ALJ determines whether the claimant is currently engaged in substantial gainful activity ("SGA"), which is defined as work that involves doing significant and productive physical or mental duties for pay or profit. 20 C.F.R. § 404.1520(a)-(b). If the claimant engages in SGA, she is not disabled, for purposes of the receiving social security benefits, regardless of the severity of his impairment(s). 20 C.F.R. § 404.1520(b). If the claimant establishes that she is not currently engaged in SGA, the ALJ then determines whether, at step two, the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A claimant is not disabled, and therefore does not qualify for disability benefits, if the ALJ finds that the claimant is not suffering from a severe impairment. 20 C.F.R. § 404.1520(c).

At step three of the evaluation, the ALJ must determine whether the claimant's severe impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant suffers from a listed impairment or the claimant's severe impairment is equal to a listed impairment, the claimant is disabled and is automatically entitled to disability benefits. 20 C.F.R. § 404.1520(d). However, if the claimant does not suffer from a listed impairment or an equal impairment, the ALJ assesses the claimant's RFC based on all the relevant evidence in the record before proceeding to step four. 20 C.F.R. § 404.1520(e). At step four, the ALJ determines whether the claimant retains the RFC to perform their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can perform their past relevant work, the ALJ's inquiry ends and the claimant is not eligible for disability benefits. 20 C.F.R. § 404.1520(f). If the claimant cannot perform their past relevant work, the ALJ proceeds to step five and must consider the claimant's RFC, age, education, and work experience to determine if the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v).

### III.   DISCUSSION

**The ALJ's Decision**

In this case, the ALJ concluded that Plaintiff had not engaged in SGA for the required period of time, and that none of his impairments, though severe, considered individually or collectively, met or medically equaled any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1. (*See* R. 15.) In her RFC analysis, between steps three and four, the ALJ accorded treating physician Dr. Acquaviva's assessments and medical opinions no deference, and instead concluded that Plaintiff has the RFC to perform the full range of light work as defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b). (*See* R. 16.) At step four, the ALJ found that Plaintiff could not perform his past relevant work. (R. 20.) At step five, the ALJ called a vocational expert, and based

on the expert's testimony, as well as Plaintiff's age, education, work experience, and RFC, concluded that Plaintiff was not disabled. (R. 21.)

Plaintiff argues that the ALJ failed to give his treating physician's functional capacity assessment due deference, displayed bias in a footnote, and failed to properly utilize the vocational expert's testimony. (Pl.'s Br. 1-2.) The Commissioner contends that the ALJ's reasoning for rejecting the treating physician's assessment was supported by the totality of the medical evidence, and that since the ALJ found Plaintiff's subjective complaints not credible based on all the medical evidence, omitting them from her hypothetical questions to the vocational expert does not constitute error. (Comm. Br. 13.)

### A. Treating Physician's Opinion

An ALJ has a duty to evaluate all relevant evidence in the record, and must explain the reasons for discounting the evidence he rejects. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001). The Social Security Regulations describe the amount of weight an ALJ must give to the treating physician's opinion. *See* 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927. The opinion of a treating physician is generally entitled to great weight, and in some cases controlling weight, when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008) (A treating physician's opinion should be given "great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000))).

Courts in this Circuit grant a treating physician's opinion substantial weight, and in order for the ALJ to reject such an opinion, she must adequately explain her reasoning. *Brownawell*, 554 F.3d at 355; *see also Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000)). In denying Plaintiff's application, the ALJ rejected Dr. Acquaviva's opinion and greatly credited the opinions of the state physician Dr. Starace, and consultative examiners Drs. Goldstein and Mills. (R. 18.) While there was a question regarding Dr. Acquaviva's status as Plaintiff's treating physician, given that there is no evidence on the record to substantiate Plaintiff's claim that he had been treated regularly by Dr. Acquaviva since 2000, ALJ Krappa discredited Dr. Acquaviva's opinion for other reasons.

In discussing Dr. Acquaviva's findings, ALJ Krappa stated,

> "[a]lthough Dr. Acquaviva reported significant limitations regarding the claimant's mental capacity, I do not find his limitations fully supported by the record. Review of the overall record indicates that the claimant is never given a GAF below 50. A GAF of 52 indicates only a moderate difficulty with social and/or occupational functioning. Dr. Acquaviva's limitations regarding concentration, persistence and pace and episodes of decompensation would suggest a much more limited GFA [sic] than those given." [3]

(R. 19.) This represents the full extent of the ALJ's explanation for disregarding Dr. Acquaviva's opinion. In other words, the ALJ reasoned that Dr. Acquaviva's opinion did not warrant deference because it was incongruent with the GAF assessments of the other physicians in this case. This Court declines to determine, at this juncture, whether a treating physician's opinion may be discounted on incongruent GAF findings alone, however, this Court does find that the ALJ's explanation of the basis for rejecting Dr. Acquaviva's opinion is woefully insufficient.

---

[3] It should be noted that the record does not reflect that Dr. Acquaviva's assessment is wholly inconsistent with that of the other physicians. For example, while being treated at Bergen Regional Medical Center in February of 2009, one physician gave Plaintiff a GAF of 52, same as Dr. Acquaviva reported in November of 2009. (*Compare* R. 307 and 334.)

9

Therefore, upon remand, because the substantial evidentiary weight accorded to the opinions of treating physicians stems from the belief that "their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time[,]" *Morales*, 225 F.3d at 317, the ALJ is first directed to develop the record regarding the extent of Dr. Acquaviva's treating relationship with Plaintiff. Next, the ALJ should conduct a thorough credibility evaluation comparing Dr. Acquaviva's opinion with that of the physicians upon whose opinions she relied, while being mindful that a treating physician's opinion is entitled to controlling weight only "when it is well-supported by medical evidence and is consistent with other evidence in the record." *Johnson v. Comm'r of Soc. Sec.*, 398 Fed. Appx. 727, 732 (3d Cir. 2010).

### B. The ALJ's Footnote Regarding Treating Physicians

In a footnote to her discussion of Dr. Acquaviva's findings, ALJ Krappa described several reasons why a treating physician might be inclined to exaggerate a patient's limitations. (R. 19 n.1.) She explained that,

> "when presented by a patient with a form requiring assessment of a patient's functioning, a doctor or psychologist may be tempted to overstate the severity of the patient's limitation(s) out of sympathy for the patient's financial circumstances or the patient's lack of insured medical treatment—both of which could be significantly improved were a patient to be awarded disability benefits. A doctor or psychologist may provide a patient with a favorable disability assessment as a reward for the patient's choosing the doctor/psychologist for treatment[,] . . . [or] for personal gain, as either new or improved health insurance coverage (i.e. Medicare as opposed to Medicaid) may enable or assist the patient's return for future treatment[,] . . . [or] in the hopes of encouraging the patient to choose the doctor for future services and/or encouraging the patient or the patient's representative to recommend the doctor/psychologist to others."

10

Id. The purpose of this footnote is unclear. ALJ Krappa did not clarify whether she was making a specific finding that Dr. Acquaviva overstated Plaintiff's limitations in a quid pro quo scheme. Contrary to the Commissioner's argument that the footnote was merely a general statement that treating physicians, like other witnesses, are not immune to bias, it is difficult to deny the connection between the paragraph in which the ALJ declared that Dr. Acquaviva's opinion lacked credibility because he exaggerated Plaintiff's condition and the corresponding footnote in which she suggests that treating physicians may be guided by personal interest when opining on their patient's medical condition. There is no evidence on the record regarding what Dr. Acquaviva stands to gain from Plaintiff's success in this matter. While this Court is not convinced that this footnote necessarily connotes bias against Dr. Acquaviva or Plaintiff, the ALJ should refrain from such inflammatory commentary in the future unless it is supported by evidence on the record.

### C. The ALJ's Hypothetical Questions to the Vocational Expert

The ALJ decided the case at step five of the sequential analysis after soliciting testimony from a vocational expert. (R. 21.) "Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). An ALJ can only consider the vocational expert's testimony "for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Id.* (citation omitted); *see also Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004) ("'A hypothetical question must reflect *all* of a claimant's impairments [(or limitations)] that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence.'" (quoting *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir.

1987)))). "In order for the answer to be considered substantial evidence, all of the plaintiff's impairments supported in the record must be reflected in the hypothetical." *Chrupcala*, 829 F.2d at 1276. Moreover, challenges "to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." *Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).

Here, the hypothetical questions submitted to the vocational expert were deficient. In addition, the ALJ inexplicably gave partial credence to Dr. Acquaviva's opinion by incorporating some of his findings into the hypothetical questions even after disregarding his opinion entirely in determining Plaintiff's RFC. For instance, the ALJ asked the vocational expert to assume, in part, that Plaintiff, "is able to perform light work, . . . unskilled and repetitive work that permits three breaks during the workday . . . and can only have occasional contact with supervisors and co-workers but no contact with the general public."[4] (R. 70-71.) Thereafter, the ALJ asked the vocational expert follow-up questions that introduced some of the findings by Dr. Acquaviva: (1) ability to maintain mental concentration during the entire workday; (2) the effect of missing multiple workdays during the month because of unpredictable symptoms; and (3) dealing with normal stress. (R. 72.) Whereas, in his Mental RFC assessment, Dr. Acquaviva rated Plaintiff poor in several other categories regarding his abilities to perform unskilled work, such as: remembering work-like procedures, maintaining attention for two-hour segments, and sustaining an ordinary routine without special supervision. (R. 337.)

As discussed *supra*, while the ALJ is permitted to credit or discredit medical evidence on the record, she must provide an adequate explanation for such a decision. Because the ALJ failed to adequately explain her reasoning for discrediting Dr. Acquaviva's findings, in the RFC analysis,

---

[4] The vocational expert concluded that the Plaintiff could not perform his past relevant work, but that there are employment opportunities in Northern New Jersey and Metro New York area that he could perform. (R. 71-72.)

12

the hypothetical questions submitted to the vocational expert were therefore deficient as they were not based on *all* medically supported impairments. *See, e.g.*, *Burns v. Barnhart*, 312 F.3d 113, 123-24 (3d Cir. 2002) (citing *Chrupcala*, 829 F.2d at 1276) (requiring "greater specificity" in conveying a claimant's disabilities to a vocational expert, and concluding that vocational expert testimony did not provide substantial evidence because the ALJ's hypothetical questions failed to incorporate specific findings). Furthermore, the ALJ's decision to include some of Dr. Acquaviva's discredited findings in her hypothetical questions is confusing.

On remand, the ALJ is instructed to explicitly identify which of Plaintiff's physical and mental impairments are supported by the record and ensure that her hypothetical questions to the vocational expert clearly and adequately convey the characteristics of said limitations.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is REMANDED for further proceedings consistent with this Opinion.

**SO ORDERED.**

s/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

cc: Steven C. Mannion, U.S.M.J.